BEAM, Circuit Judge.
Nicolas P. Retsinas appeals from a judgment entered against him in the district court[1] for violating 12 U.S.C. § 1831j(a)(2), which prohibits termination of a banking employee who provides information to authorities regarding possible illegal activity. We affirm.
I. BACKGROUND
Michael Haley began working as a bank examiner for the Office of Thrift Supervision *1247 (OTS) in 1977. As an examiner, he inspected various OTS-regulated banks in order to evaluate the safety and soundness of their operations. In 1981, he was assigned to examine Marion County Mutual Loan and Building Association (MCM). MCM, like many other thrift institutions, suffered large capital losses in the early 1980’s, as a result of high interest rates on deposits and low interest rates on mortgages. In 1986, MCM began to show signs of financial recovery. Haley believed that MCM’s management played a key role in its improved condition. However, Robert Maffitt, the OTS supervisor responsible for the overall regulation of MCM, was not satisfied with the progress made toward restoring MCM’s financial health by current management.
In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforce-' ment Act (FIRREA), which changed the capital requirements for banks like MCM. Among' the changes were (1) increased capital maintenance requirements; (2) different capital requirement standards; and (3) new deadlines in which to meet the new requirements. MCM was still below the standard in terms of its capital holdings, and the OTS was concerned about its ability to meet these new requirements. Maffitt requested that MCM provide the OTS with detailed plans for addressing its capital deficiencies. Furthermore, he asked MCM’s board of directors to sign a consent agreement allowing the OTS to seek out an appropriate acquiror or merger partner for MCM. The board refused, proposing instead to raise the necessary capital through a stock conversion. Additionally, the board suggested the use of MCM’s $1,050,000 in net worth certificates as capital.
During an examination he conducted in July of 1989, Haley discussed the status of MCM with Bayard Plowman, MCM’s managing officer. Haley remained favorably impressed with both the financial progress of MCM and the management skills of Plowman and the board of directors. Another OTS examiner who visited MCM in 1989, Carmen Gassert, shared Haley’s positive views regarding the future of MCM. Gassert informed Maffitt that, in her opinion, the proposed stock conversion would involve a minimal insurance risk and was a feasible strategy for MCM to raise capital. Maffitt, however, continued to disagree with the assessments of both Haley and Gassert.
In January of 1990, pursuant to the new FIRREA legislation, MCM submitted a capital plan to the OTS. The plan called for capital enhancement by means of a stock conversion and a conversion of net worth certificates into core capital. The OTS disapproved of the plan, partly because it determined that a stock conversion posed too great a risk to the insurance fund. In addition, the OTS did not believe the net worth certificates were convertible into any instrument that would qualify as core capital. Upon researching the issue, however, Haley discovered that the certificates were indeed convertible into capital. He informed his OTS superiors of this, but they did not heed his comments. The OTS subsequently rejected MCM’s capital plan.
Concerned by the OTS’s apparently unfair and arbitrary treatment of MCM, Haley searched OTS files and found that the agency was determined to replace the current management at MCM. Maffitt, Haley discovered, intended to put MCM into receivership if he could not compel the board of directors to sign the consent agreement giving the OTS the power to authorize a sale or merger. He also learned that Roosevelt Federal Savings and Loan (Roosevelt) was the most likely acquiror of MCM. Roosevelt, however, had a poor lending record in the community, and Haley regarded Roosevelt’s acquisition of or merger with MCM as a breach of duty on the part of the OTS. Furthermore, Haley believed that both the forced merger and the refusal to recognize the capital value of the net worth certificates potentially violated fed-, eral banking laws and regulations.
Haley contacted Plowman at MCM with this information. Plowman told Haley that he intended to bring MCM’s situation to the attention of Congress or the FDIC. Haley offered to write a letter to Congress on behalf of MCM, but Plowman advised that doing so might cost Haley his job. Haley then drafted a memorandum (the Haley Memo) dated July 3, 1990, outlining his understanding of the OTS’s involvement with MCM. The Haley Memo was addressed to *1248 Maffitt, with copies to other superiors at the OTS and to Skip Sage, a state regulator of Marion County. In addition, although the OTS was unaware of it at the time, Haley forwarded a copy to Plowman at MCM. He attached a note instructing Plowman to use the memorandum in any way that would help save MCM from the OTS.
Shortly thereafter, Harold Chapman, the FDIC examiner in charge of an ongoing investigation of MCM, received two copies of the Haley Memo, one from Plowman and one from Carmen Gassert at the OTS. On July 17, 1990, Chapman showed his copy of the Haley Memo to Tim O’Leary, one of Haley’s supervisors at the OTS, and told O’Leary that he had received it from Plowman. Upon learning that Haley had provided the memo to Plowman, the OTS terminated him for disclosing confidential OTS information to an outside third party. Haley appealed his discharge to the Merit Systems Protection Board (MSPB), claiming that he was a whis-tleblower entitled to protection under 5 U.S.C. § 2302(b)(8). The MSPB found that Haley did not meet the requirements for protection under the statute and upheld the discharge. The Federal Circuit Court of Appeals affirmed on the same grounds in 1992.
In the meantime, Congress amended 12 U.S.C. § 1831j to extend whistleblower protection to employees of federal banking agencies such as the OTS. The amendment was made retroactive to January 1, 1987. Invoking the new provision, Haley filed this action against Nicolas P. Retsinas, Director of the Office of Thrift Supervision, alleging that he was unlawfully retaliated against for indirect- • ly providing information to the FDIC about possible violations of law. The district court, sitting without a jury, found in favor of Haley and awarded damages totaling $723,533 for back pay, future loss of income, and compensatory damages. Retsinas appeals, arguing, primarily (1) that Haley should be collaterally estopped from relitigating the issue of why he was terminated; (2) that Haley did not make a protected disclosure under - section 1831j(a)(2); and (3) that Haley did not provide information regarding a possible violation of law.
II. DISCUSSION
A. Collateral Estoppel
Initially, Retsinas claims that Haley should not be permitted to relitigate the issue of the reason for his discharge, which was previously decided in the MSPB and the Federal Circuit Court of Appeals decisions. In the previous proceedings, the ALJ found that Haley was discharged because of his unauthorized disclosure to Plowman. Therefore, Retsinas argues, Haley is collaterally estopped from trying to prove that he was fired because of the disclosure to the FDIC.
“Under the doctrine of collateral estoppel, ... the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.” Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Four requirements must be met before a finding in a previous action is conclusive in the instant action: (1) the issue must be identical to that involved in the prior proceeding; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. See Farmland Indus. Inc. v. Morrisort-Quirk Grain Corp., 987 F.2d 1335, 1339 (8th Cir.1993).
The issue in this case is not identical to. the issue litigated before the MSPB and the Federal Circuit. In the previous proceedings, the reason for Haley’s discharge was determined specifically in the context of the section 2302(b)(8) action. The ALJ found that Haley did not reasonably believe that the OTS had violated the law or abused its authority, and that he was fired because of the disclosure to Plowman. The issue in this case differs for a number of reasons. First, although section 2302(b)(8) requires that the whistleblower reasonably believe the employer has violated the law, section 1831j(a)(2) requires only that the disclosure contain information evidencing “any possible violation of any law.” The two determinations are not the same. Second, the finding that Haley was fired for the disclosure to Plowman does *1249 not necessarily mean that he is not entitled to the protection of section 1831j(a)(2). In the prior suit, Haley had no opportunity to litigate whether he was terminated because his disclosure to Plowman resulted in a disclosure to the FDIC. Furthermore, in the present case, Haley was only required to show that the disclosure to the FDIC was a contributing factor in the OTS’s decision to discharge him. See Rouse v. Farmers State Bank, 866 F.Supp. 1191, 1207 (N.D.Iowa 1994). Even if the OTS fired him because he gave the memo to Plowman, they may have also fired him because he gave the memo, albeit indirectly, to the FDIC. Collateral es-toppel is therefore inappropriate in this case.
B. The “Request” Requirement
Section 1831j(a)(2) provides:
No Federal banking agency ... may discharge ... any employee ... because the employee (or any person acting pursuant to the request of the employee) provided information to any such agency ... or to the Attorney General regarding any possible violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.
12 U.S.C. § 1831j(a)(2) (emphasis added). The statute includes the FDIC and the Director of the Office of Thrift Supervision in its definition of “Federal banking agency.” 12 U.S.C. § 1831j(e). The parties agree (1) that Haley did not directly provide the memo to the FDIC, and (2) that Haley did not expressly request that Plowman give the memo to the FDIC. The district court found, however, that Haley told Plowman to use the memo to save MCM from perceived abuse by the OTS, that the FDIC was one of several possible destinations for the memo that Haley had considered, and furthermore, that Plowman and Haley had discussed Plowman’s intention to contact Congress or the FDIC about the problem.[2] The court eon-eluded that Haley’s actions were within the scope of protected behavior under the statute. This is a mixed finding of law and fact, which we review de novo. See Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir.1996). The issue before us is whether Haley’s conduct was sufficient to constitute a “request” and thus to trigger the protection of section 1831j(a)(2). This court is unaware of any ease law addressing this question, and we therefore view it as one of first impression.[3]
The first step in statutory interpretation is to look at the text of the statute itself. See United States v. Talley, 16 F.3d 972, 975 (8th Cir.1994). If the plain meaning of the language clearly expresses the meaning Congress intended, the judicial inquiry ends there. See United States v. S.A., 129 F.3d 995, 998 (8th Cir.1997), cert. denied, 1998 WL 54258 (U.S. March 9,1998) (No. 97-7733). If, however, the language of the statute is ambiguous,, we are obliged to consider ‘“the purpose, the subject matter and the condition of affairs which led to its enactment.’ ” Id. (quoting Lambur v. Yates, 148 F.2d 137, 139 (8th Cir.1945)). “When the meaning of a statute is questionable, it should be given a sensible construction and construed to effectuate the underlying purposes of the law.” S.A., 129 F.3d at 998.
In this case, the statute purports to cover situations in which the “employee (or any person acting pursuant to the request of the employee) provided information.” Haley prepared the memo in question; he provided it to Plowman; he directed Plowman to provide it to someone with the authority to stop the OTS. Plowman then turned the memo over to the FDIC. In this scenario, was Plowman “acting pursuant to. the request of’ Haley when he provided information to the FDIC? On the one hand, Haley did not ask that Plowman give the memo to the FDIC. If *1250 the statute requires a request that specifically mentions the intended recipient of the information, then Plowman was not- “acting pursuant to the request of’ Haley and the statute does not cover the behavior. On the other hand, the word “request” does not necessarily dictate any level of detail. A “request” is “the act of asking for something to be given or done.” The Random House Dictionary of the English Language 1636 (2d ed.1987). Haley initially considered direct action, such as writing a letter to Congress or sending the memo directly to the Chairman of the FDIC, but he rejected the idea because he feared retaliation by the OTS. Instead, he prepared the memo and gave it to Plowman. He knew Plowman was already considering notifying Congress or the FDIC about the situation, and that Plowman was in contact with others outside the OTS who might be able to intervene. When he gave the memo to Plowman and asked Plowman to provide it to authorities who could help save MCM, that knowledge was implicit. We therefore find that Haley’s behavior was sufficient to constitute a “request.” When Plowman provided the information to the FDIC, he was doing as Haley had suggested, and thus, was “acting pursuant to the request of’ Haley.
Even if the text is ambiguous with respect to the meaning of “request,” the policy and purposes behind the statute lead us to the same conclusion. Laws protecting whistleblowers are meant to encourage employees to report illegal practices without fear of reprisal by their employers. These statutes generally use broad language and cover a variety of whistleblowing activities. Accordingly, when the meaning of the statute is unclear from its text, courts tend to construe it broadly, in favor of protecting the whistleblower. This is often the best way to avoid a nonsensical result and “to effectuate the underlying purposes of the law.” S.A., 129 F.3d at 998.
For example,' the plaintiff in Neal v. Honeywell, Inc.[4] claimed that she was entitled to whistleblower protection under 31 U.S.C. § 3730(h), which applies to “any employee who” suffers retaliation “because of lawful acts done by the employee ... in furtherance of ... an action filed or to be filed” under the False Claims Act. Neal v. Honeywell, Inc., 33 F.3d 860, 861 (7th Cir. 1994). She reported her co-workers’ fraud, but the United States eventually settled with the employer and no “action” under the False Claims Act was ever filed. The plaintiff was subsequently discharged and sought the protection of the whistleblower statute. In its defense, the employer claimed that the statute applied only to situations in which an “action” under the False Claims Act was or would be filed. The Seventh Circuit construed the statute to cover the plaintiff’s actions. Id. at 864. To read it otherwise, the court determined, would yield the absurd result that employees would be protected “in doubtful cases (the kind that breed litigation),” but not “when the fraud is so clear that the employer capitulates, averting litigation.” Id.
The Eleventh Circuit took a similarly broad view of another federal whistleblower statute in Bechtel Constr. Co. v. Secretary of Labor, 50 F.3d 926 (11th Cir.1995). The statute in question provided protection for any employee who “commenced, caused to be commenced,” “testified] in,” or “assisted] or participated] in any manner in” “a proceeding for the administration or enforcement of any requirement imposed under ... the Atomic Energy Act.” Id. at 931 (citing 42 U.S.C. § 5851(a)). The court held that informal complaints made by an employee were covered by the statute.[5] Bechtel, 50 F.3d at 932-33. In its analysis, the court stated that *1251 this interpretation “promotes the remedial purposes of the statute and avoids the unwitting consequence of preemptive retaliation, which would allow the whistleblowers to be fired or otherwise discriminated against with impunity for internal complaints before they have a chance to bring them before an appropriate agency.” Id.
We agree with the district court that section 1831j(a)(2) covers Haley’s actions in this case. This interpretation protects those who provide information about violations of the law to the appropriate authorities, but who try to safeguard themselves by blowing the whistle discreetly — i.e., by “requesting” with a mere suggestion or an implicit understanding. Particularly when the employee’s failure to make a direct request is driven by fear of the very conduct the statute proscribes (namely, retaliation), it would be unreasonable to deny the statute’s protection once the employee has completed the task the statute seeks to encourage (namely, alerting authorities to possible illegal activity). Our reading of the statute best effectuates the policy Congress sought to achieve in passing it.
C. The “Possible Violations of Any Law” Requirement
The third point raised by Retsinas on appeal is that the Haley Memo referred only to Haley’s personal disagreement with the OTS’s policy regarding MCM, and not to any illegal activity of which the OTS may have been guilty. In his brief, Haley argues at length that the OTS’s policy regarding MCM was a possible violation of many laws and regulations. The issue, of course, is not what arguments can be made in retrospect, but what information was conveyed in the memo itself.
In the memo, Haley stated, among other things,
I cannot believe that Congress intended for the FIRREA legislation to be used as a pretext for removing a board of directors and management who have managed soundly and fulfilled all of their fiduciary responsibilities from an institution which is viable and poses no risk to the insurance fund. After all, this is America. The Federal government should not be permitted to take a profitable business away from anyone without a lengthy period of due process and until all reasonable alternatives are exhausted.
The language of section 1831j(a)(2) is broad. It refers to “information ... regarding any possible violation of any law or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.” After reviewing the memo, we cannot conclude that it does not contain “information regarding any possible violation of any law,” or, at least, information regarding “an abuse of authority” by the OTS; Accordingly, we find that Haley’s disclosure is protected by section 1831j(a)(2).
We have reviewed Retsinas’s other arguments on appeal, and we also find them to be without merit.
III. CONCLUSION
For the foregoing reasons, the judgment of the district court is affirmed.

. The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

. These determinations were reached by the district court in its capacity as the fact-finder in this case. We accept the district court’s findings of fact, because we do not find them to be clearly erroneous. See Black Hills Corp. v. Commissioner of Internal Revenue, 73 F.3d 799, 804 (8th Cir.1996).

. We do recognize two cases, Wallen v. Fed. Home Loan Bank, 83 F.3d 1575 (9th Cir.1996), and Nowlin v. Resolution Trust Corp., 33 F.3d 498 (5th Cir.1994), both of which refused to extend whistleblower protection to employees who complained to authorities other than those specifically enumerated in the statute. These holdings, however, are not applicable to the situation presented in this case.

. In our case, the district court cited Neal v. Honeywell, Inc., 826 F.Supp. 266, 270 (N.D.Ill. 1993), and Lao Chua v. St. Paul Fed. Bank for Sav., 1995 WL 472773 (N.D.Ill.1995) (relying on the district court’s language in Neal), for the proposition that federal whistleblower statutes should be broadly construed. The lower court opinion in Neal, however, was not the final disposition of that case. See Neal v. Honeywell, Inc., 33 F.3d 860 (7th Cir.1994). On appeal, the Seventh Circuit criticized the district court's broad construction language and balked at the idea that "all statutes should receive the reading most favorable to whistleblowers.’’ Id. at 863. The court nevertheless affirmed the district court’s decision that the whistleblower statute applied to the plaintiff's situation. Id. at 863-64.

. The statute now expressly includes internal complaints. 42 U.S.C. § 5851(a)(1)(A).